# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DAVID A. FRAZEE,

            **Plaintiff,**               **CIVIL ACTION NO. 06-CV-14779**

    **vs.**

                                **DISTRICT JUDGE PAUL V. GADOLA**

**COMMISSIONER OF**           **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

            **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:**    Defendant's Motion for Summary Judgment should be GRANTED and Plaintiff's Motion for Summary Judgment should be DENIED, as there was substantial evidence on the record that Plaintiff remained capable of performing a significant number of jobs in the economy.

                                       **\*\*\***

      Plaintiff filed an application for Disability Insurance Benefits on October 31, 2002, alleging that he had been disabled and unable to work since March 25, 2002, due to a compound fracture of the left ankle with infection (TR 59). The Social Security Administration denied benefits (TR 37). A requested *de novo* hearing was held on November 8, 2004, before an administrative law judge (ALJ), who subsequently denied claimant's application and found that the claimant was not under a "disability" as defined in the Social Security Act at any time through the date of the February 25, 2005 decision (TR 28-35, 331). The ALJ found that although claimant could not perform the full range of sedentary work, there are a significant number of jobs in the national economy that claimant could perform (TR 34). The Appeals Council found that claimant was disabled during the period

from March 25, 2002, ending on July 8, 2003 and was therefore entitled to a closed period of benefits from March 25, 2002 to September 30, 2003 (TR 14). The Appeals Council adopted the ALJ's findings and conclusions that claimant was not disabled for the period beginning July 8, 2003 (TR 11). The parties have filed Motions for Summary Judgment and the issue for review is whether defendant's denial of benefits was supported by substantial evidence on the record.

Plaintiff was thirty-eight years old at the time of the administrative hearing, had a high school diploma, and previously worked as an installer, CNC operator, masonry worker, bouncer, bartender and furniture sales person (TR 28-29, 60, 65, 79-85, 336-340). On March 25, 2002, plaintiff fell off his porch and broke his ankle (TR 59, 73, 90). Plaintiff underwent an operation and the ankle thereafter became infected (TR 59, 96). Following the injury and operation, plaintiff alleged that he used crutches to stand and walk and had to frequently prop his leg in the air to relieve swelling and pain in the ankle (TR 59, 73-75). Plaintiff's infection was treated with antibiotic (Bactrium) (TR 62, 64) and his discomfort was treated with Vicodin (TR 64). After a face-to-face interview with the claimant, the Social Security Administration's Field Office interviewer noted in the Disability Report "[t]he claimant did not walk on left ankle (foot). He used crutches." (TR 71). In a Pain/Daily Activities Questionnaire dated November 8, 2002, plaintiff indicated that walking on the crutches causes him pain that lasts until he lays down and props his leg in the air (TR 73). He further indicated that he "can't walk at all," he is in pain all the time, the Vicodin he takes for the pain makes him tired, he cannot stand without crutches, the injury has affected his ability to climb stairs and he has trouble sleeping at night due to the pain in his ankle (TR 73-78). He also stated that friends help him with shopping, vacuuming, laundry, taking out the garbage and cooking (TR 75). He did indicate, however, that he could bathe himself (TR 75).

At the November 2004 administrative hearing, plaintiff testified that he could not "get around" without extreme pain and that he takes Vicodin, but it does not seem to help. (TR 342). He stated that he showers and can perform grooming tasks and goes out to see friends and family. (TR 343). He testified that he needs to be in a place where he can prop his leg up or it will swell up. (TR 343). Plaintiff testified that on a scale of one to ten, his pain averages a six or seven. (TR 343). Plaintiff drove to the hearing and propped his leg up in his truck so the swelling would go down before coming in to the hearing (TR 343). He testified that he could walk, with or without his cane, but "not very far." He further testified that he can prepare his own meals, dust, mop and vacuum, wash laundry and dishes and grocery shop (TR 348).

During the hearing, a vocational expert (VE) testified in response to hypothetical questions posed by the ALJ. Asked to assume a person able to do sedentary work with a sit-stand option, the VE testified that such a person would not be capable of performing plaintiff's past work (TR 360-361). Asked to assume a person who is a younger individual with one year of college and past work history the same as the claimant's and whose residual functional capacity is as previously stated, but further limited by the need to prop his leg up occasionally or fifty percent of the time and who should not be around hazardous machinery, the VE testified that such an individual would be able to perform numerous jobs such as clerical jobs (4,500), security guard monitor (2,200) and visual inspector (2,000) (TR 361). The VE further testified that, assuming plaintiff's testimony were credible, he would not be able to perform any other jobs (TR 362).

**MEDICAL EVIDENCE**

On March 25, 2002, plaintiff fractured his ankle when he fell off his front porch (TR 73). The examining physician, Stephen R. Burton, M.D., diagnosed a high Dupuytren fracture with a wide mortis of the left ankle and recommended surgical treatment for the fracture (TR 90). On April 2, 2002 Susan Mosier-LaClair, M.D. performed surgery to attach screws and a metal plate to plaintiff's ankle to transfix the distal fibula and the tibia and fibula (TR 95-98). Following the operation, plaintiff was put in a postoperative Jones dressing to be changed to a cast two weeks after the surgery (TR 97). On April 21, 2002 Dr. Mosier-LaClair examined plaintiff, who complained of increasing ankle pain since the previous night and appeared to be in mild distress. Plaintiff did not have fever or chills and did not otherwise feel sick (TR 99). Upon examination, Dr. Mosier-Laclair noted that the wound was not completely healed, however there did not appear to be frank infection and there was no drainage (TR 99). She noted that x-rays showed good alignment of the fracture and syndesmotic screws (TR 99). Plaintiff was placed in a knee splint and told to return if he developed fever or felt worse (TR 99).

On April 28, 2002 plaintiff was admitted to McLaren Regional Medical Center with a diagnosis of left ankle postoperative wound dehiscence of the fibular fracture repair (TR 102), i.e., left post-operative leg infection (TR 101). The radiologist, R.J. Wolf, M.D., examined views of plaintiff's ankle and reported "[s]tatus post CRIF of distal left fibula fracture, avulsion fractures involving the left ankle proper and previously disrupted ankle mortise, now in improved, near anatomic alignment, positioning and angulation." (TR 109). The next day, in response to the infection, Dr. Mosier-LaClair and Chris VanPelt, M.D. performed an excisional debridement of the left ankle wound and plaintiff was readmitted for further postoperative orthopedic care (TR 102). On April 20 and May 2, 2002 plaintiff complained of soreness in the left ankle. On May 2, 2002

plaintiff was given Percocet to help with the pain, with Ibuprofen scheduled in between, around the clock (TR 108). On May 3, 2002 a wound vacuum assisted closure (VAC) was applied to plaintiff's ankle (TR 140). Plaintiff was discharged home the same day with Visiting Nurse follow-up to change the VAC dressings (TR 103).

Dr. Mosier-LaClair examined David again on May 17, 2002 and noted that the wound dehiscence was "healing nicely with excellent meaty granulation in its bed." (TR 116). There was no bone or hardware exposed at the examination (TR 116). Dr. Mosier-LaClair also noted that his foot was in a plantar flexed position of about 25 degrees and "attempts at forced ankle dorsiflexion past this reproduces severe pain and he pulls his leg away from me" (TR 116). She noted that "[t]his is consistent with equinus contracture or plantar flexion contracture of the Achilles tendon from not wearing his fracture boot." (TR 116). Dr. Mosier-LaClair's May 23, 2002 notes indicate that plaintiff called to request more Percocet (TR 114). They informed plaintiff that they could not give him another prescription so soon for Percocet and no pharmacy would fill it again this soon because it is dangerous to take that much of a narcotic medicine in such a short period of time (TR 114). In notes from both May 17 and May 23, 2002, Dr. Mosier-LaClair indicated that plaintiff was noncompliant in his medical care (TR 114-17). He was developing an equinus contracture of the ankle as a result of not wearing the fracture boot and he continued to smoke a pack of cigarettes a day, which would delay his wound healing (TR 114-17). In both sets of notes she stated that if the fracture heals, but the wound does not, he must remain non-weight bearing (TR 115 and 117).

Plaintiff underwent physical therapy from July 1, 2002 and was discharged August 9, 2002, after eleven treatments (TR 138). According to the Discharge Summary, plaintiff was progressing well through his physical therapy treatments although he reported a moderate amount of pain at his

July 10 therapy session.  His last therapy session was on July 26, 2002 (TR 138).  On July 29, 2002 Dr. Burton performed another operation on plaintiff's ankle, this time for incision and drainage and excision and drainage (TR 128).   Plaintiff was discharged from physical therapy secondary to the post surgical status of the July 29 surgery (TR 138).

On October 23, 2002 plaintiff had a follow-up consultation with Gregory Forstall, M.D. (TR 141).  Dr. Forstall noted that the wound VAC was still applied to the ankle (TR 141).  On November 22, 2002 Dr. Burton, assisted by Rajeev Jain, M.D., operated on plaintiff to remove the left ankle hardware and perform excisional debridement and irrigation (TR 187).  Plaintiff was discharged home on November 25, 2002 with Visiting Nurse Association home plans in place and instructions to "increase his activity as tolerated using crutches for ambulation but maintaining a nonweightbearing status over the left lower extremity."  (TR 189 and 190).  He was instructed to continue on vancomycin intravenously, as well as the Bactrim DS, and to take one to two Vicodin tablets every  4 to 6 hours as needed for pain.  (TR 189).  There were no abnormal complications with the operation (TR 189).

Plaintiff attended a series of follow-up appointments with Dr. Burton from December 2002 through July 2003, which showed improvement to the wound (TR 173-180).  Correspondence from Dr. Burton dated December 20, 2002 states that the doctor did not anticipate that plaintiff could undertake "any type of gainful employment until at least June of 2003" and Dr. Burton's Disability Release for Work states a return to work date of June 9, 2003  (TR 179, 181).  Subsequent notes indicate improvement during this period.  On April 9, 2003, Dr. Burton issued a Disability Release for Work indicating that plaintiff could return to work on April 21, 2003 with no restrictions (TR 175).  This is not inconsistent with Dr. Burton's notes about plaintiff's progress during early 2003.

On February 5, 2003 Dr. Burton noted that overall plaintiff felt that he was making progress and was not having as much discomfort. (TR 177). Plaintiff was to see if he could go without wearing the brace, depending on his comfort level. (TR 177). On March 19, 2003 Dr. Burton indicated that plaintiff was doing "quite a bit better" and had been able to walk a little bit without wearing the brace, although his ankle became shaky (TR 176). On May 14, 2003 Dr. Burton noted that plaintiff felt he was making good progress and was not having nearly as much discomfort. Dr. Burton recommended that plaintiff "increase his activities as he tolerates." (TR 174).

On February 14, 2003 Dr. Burton completed a "Residual Functional Capacity Statement" regarding plaintiff's limitations (TR 163). Dr. Burton indicated that in the course of an 8-hour workday plaintiff could sit two hours, stand one hour and walk one hour (TR 163). Without breaks, plaintiff should be able to sit for one hour. However Dr. Burton also indicated that plaintiff would need to sit, stand, lie down or recline at his discretion (TR 163). In the course of an 8 hour workday, plaintiff could, on an extremely limited basis, lift or carry up to 10 pounds and occasionally (comprising up to 1/3 of plaintiff's work tasks) lift up to five pounds (TR 164). Plaintiff has no limit on the use of his upper extremities, and can use them for tasks including repetitive and forceful use of airguns and power tools (TR 165).

The record indicates that during June and July 2003 plaintiff was on his feet and working. On June 3, 2003 Dr. Welton reported that plaintiff called her because he had increased drainage from his leg the previous week (TR 206). "He had been up walking up at work, so he had been up all night more lately. Now, he no longer has any drainage. He went to the emergency room. They put him on Cipro and he is currently taking that. He had some yellow-white drainage. No pain." (TR 206). "Now, he still has mild erythema on the leg but no drainage and very little edema and

erythema." (TR 206).  On June 28, 2003, plaintiff returned to the emergency room at McLaren Regional Medical Center and complained of worsening pain in the wound and a mild yellow discharge, which he noticed the night before (TR 200).  He was directed to take Cipro, stay off left leg as much as possible, and make an appointment with Dr. Welton's office to follow-up (TR 202).

On July 8, 2003 Dr. Burton noted that plaintiff had an episode approximately one week prior regarding drainage from the incision.  Dr. Burton stated that plaintiff "had been working quite hard, 12 hours a day, doing a lot of physical labor.  He did not have any surrounding erythema or any real pain, but it drained for several days." (TR 173).  Dr. Burton concluded in his plan "At this time I believe this is more due to the mechanical stresses on the tissue and is not a new or recurrent infection.  He is to try to go back to work in a few weeks if he can tolerate." (TR 173).

On November 19, 2004 Dr. Burton, assisted by Maher Bahu, M.D., performed a left ankle arthrodesis (fixation of the joint by fusing) on plaintiff (TR 286).  Plaintiff attended check-ups with Dr. Burton following the November 19, 2004 operation.  This series of check-ups indicated improvement in plaintiff's condition (TR 290-293).  On January 1, 2005 Dr. Burton noted that "[t]he patient is able to bear a significant amount of weight on the left while standing without any significant pain." (TR 292).  On February 2, 2005 Dr. Burton noted "[o]verall patient feels he is doing better since he was last seen.  He is having less discomfort." (TR 293).  The x-rays showed that the tibiotalar fusion appeared to be healing well in a satisfactory position and there was no evidence of loosening of the screws (TR 293).


## ADMINISTRATIVE LAW JUDGE'S AND APPEALS COUNCIL'S DETERMINATIONS

The ALJ found that although claimant met the non-disability requirements and was insured for benefits through the date of the ALJ's opinion, claimant had not engaged in substantial gainful activity since the alleged onset date. However, claimant's fracture of the left leg and osteomyelitis are considered "severe" based on the requirements in Regulations 20 CFR §§ 404.1520(c) and 416.920(c) and he did not have an impairment that met or equaled the Listings of Impairments (TR 34). The ALJ found that claimant's allegations of his limitations were not totally credible. The ALJ found that plaintiff could not perform any of his past relevant work and had no transferrable skills from any past relevant work, but concluded that he was capable of performing a significant range of sedentary work and therefore was not suffering from a disability under the Social Security Act (TR 34).

Plaintiff appealed the ALJ's decision to the Appeals Council. The Appeals Council granted the request for review. The Appeals Council adopted the ALJ's findings with regard to the provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case and the evidentiary facts (TR 11). Furthermore, the Appeals Council adopted the ALJ's findings and conclusions that the claimant is not disabled for the period beginning July 8, 2003. The Appeals Council ultimately found that plaintiff was disabled for the period from March 25, 2002 through July 7, 2003. The Appeals Council did not adopt the ALJ's findings and conclusions regarding the severity of plaintiff's impairments during the period from April 29, 2002 until July 8, 2003 (TR 11).

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. "[I]f the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision." *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). The Appeals Council's decision is the final decision to be reviewed in this matter. Because the Appeals Council's decision incorporates portions of the ALJ's findings and conclusions, both decisions are referenced in the analysis.

Judicial review of the Commissioner's decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this court to try cases *de novo*, or resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the

substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts").

## DISCUSSION AND ANALYSIS

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e). If plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his RFC, age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *See id.* § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

First, plaintiff asserts that the ALJ should have found that he suffers from a gross deformity of a weight bearing joint under Listings 1.02 (and 1.06) resulting in the inability to ambulate effectively. Second, plaintiff asserts that the ALJ failed to give adequate weight to the opinion of his treating surgeon, Dr. Burton. Third, plaintiff asserts that the hypothetical question that the ALJ posed to the VE failed to comprehensively describe plaintiff's limitations.

Having reviewed the entire record, the undersigned is persuaded that the ALJ's decision was supported by substantial evidence for the following reasons.

## THE APPEALS COUNCIL CORRECTLY FOUND THAT PLAINTIFF DID NOT MEET THE GROSS DEFORMITY LISTING AFTER JULY 7, 2003

As an initial matter, under 20 C.F.R. 404.970(b), the Appeals Council shall consider any new and material evidence

> [O]nly where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.

20 C.F.R. 404.970(b). The ALJ's decision in this matter is dated February 25, 2005. The Appeals Council's decision references evidence and medical records relating to the period after February 25, 2005. The undersigned reaches the conclusions herein without reference to material relating to the period after February 25, 2005 and finds that the Appeals Council's incorporation of the same is harmless error because substantial evidence remains on the record to support the Appeals Council's determination that plaintiff was not disabled after July 7, 2003.

In his Motion for Summary Judgment, plaintiff first alleges that there is not substantial evidence in the record to support the Appeals Council's finding that he did not meet Listings 1.02 or 1.06 after July 7, 2003. Listing 1.02, Category of Impairments, Musculoskeletal reads:

*Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

(Emphasis in original.)

Listing 1.06 reads:

*Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.* With:
A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid;
and
B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

Listing 1.00B2b provides a definition for the inability to ambulate effectively. One example of ineffective ambulation is "the inability to walk a block at a reasonable pace on rough or uneven surfaces." Listing 1.00B2b.

Plaintiff has the burden of demonstrating that his impairment meets or equals a listed impairment. *Foster v Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder"). The parties do not challenge the Appeals Council's finding that plaintiff was disabled under Listing 1.06 from March 25, 2005, ending July 8, 2003. The Appeals Council adopted the ALJ's findings and conclusions that plaintiff was not disabled for the period beginning July 8, 2003.

Plaintiff argues that the ALJ did not give appropriate weight and consideration to the opinions of his treating physicians, including Dr. Burton. It is well settled that the opinions and

diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. § 404.1527(d)(2), the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.

A look at the record and the Appeals Council's opinion as it incorporates the ALJ's findings and conclusions reveals that the Appeals Council and the ALJ relied almost solely on the opinions and notes of plaintiff's treating physicians, including Dr. Burton. In finding that plaintiff did not meet any of the Listings after July 7, 2003, the ALJ and the Appeals Council relied on the reports of several of plaintiff's treating physicians, including Dr. Burton, and gave those opinions controlling weight. As evident from the medical history, plaintiff showed marked improvement, progress, satisfactory healing and less discomfort at examinations of the injury following the November 22, 2002 surgery (TR 173-181). The ALJ dutifully cited to and discussed evidence from plaintiff's treating physicians including Dr. Mosier-LaClair, Dr. Welton and Dr. Burton. Contrary to plaintiff's argument, the ALJ and the Appeals Council relied upon Dr. Burton and the other treating physicians' opinions in rendering its decision.

The ALJ specifically relied on Dr. Burton's Disability Release for Work, dated April 9, 2003, stating that plaintiff could return to work. This work release was consistent with a series of notes in which Dr. Burton indicated a decrease in plaintiff's discomfort, improvement in plaintiff's ankle and directions to increase activity as tolerated (TR 173-81). The Appeals Council also relied on reports from Dr. Burton in finding that there was a decrease in severity of plaintiff's condition, based on changes in signs and symptoms. The Appeals Council further relied on x-rays and

laboratory results in finding an increase in functional capacity and decrease in severity after July 7, 2003 (TR 12).

Plaintiff further argues that pursuant to the Listings, he did not meet the definition of the ability to ambulate effectively. Plaintiff argues that Dr. Burton indicated as late as February 2006 that plaintiff could not walk a block at a reasonable pace. Plaintiff's Motion & Brief in Support of Summary Judgment at 10. On February 20, 2006, Dr. Burton affirmed that plaintiff's "impairment interferes with his ability to walk a block at a reasonable pace on uneven or rough surfaces." (TR 329).

As discussed above, the Appeals Council shall consider new and material evidence submitted "if it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. 404.970(b). Dr. Burton's February 20, 2006 note post-dates the ALJ decision of February 25, 2005, however the comments claim to address plaintiff's limitations since the November 2004 surgery. To the extent that Dr. Burton's note relates to the period before the ALJ's February 25, 2005 decision, it is properly considered.

It is not clear from the record in what way plaintiff's impairment "interferes" with his ability to walk a block at a reasonable pace on rough or uneven surfaces. The standard under Listing 1.00B2b is the "inability" to walk a block at a reasonable pace on rough or uneven surfaces. Dr. Burton does not state, nor does the record show, that plaintiff is unable to complete this activity. The plaintiff did not meet his burden to establish that he met the criteria for the Listing after July 7, 2003.

The ALJ and the Appeals Council properly considered and gave controlling weight to plaintiff's treating physicians' opinions and evidence. Indeed, the Appeals Council relied on the

treating physicians' opinions in the final decision.  To the extent the Appeals Council relied on the opinion of a medical expert, as discussed below, the expert's opinion was not inconsistent with the opinions of the treating physicians.

Plaintiff points to his own testimony that he could not walk a block at a reasonable pace as evidence that he was disabled under the Listings.  The ALJ found plaintiff's testimony to be less than credible, and detailed its findings in its decision.  The ALJ's conclusions regarding credibility should be accorded deference and should not be discarded lightly because the ALJ has the opportunity to observe the demeanor of a witness.  *See Casey v. Secretary of Health and Human Services,* 987 F.2d 1230 (6th Cir. 1993).

A  finding that a claimant is not credible must be supported by substantial evidence in the same manner as any other ultimate factual determination.

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.
>
> . . . The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.

Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34485-86 (1996).  The assessment must be based on a consideration of all of the evidence in the case record, including

> Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and

other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34485-86 (1996).

Here, the ALJ stated "after careful consideration of the entire record, the undersigned finds the claimant's testimony, with respect to the extent and severity of his impairment and the resulting functional limitations, to be somewhat overstated and inconsistent with the available evidence." (TR 31). The ALJ discussed specific instances in which the claimant's allegations were inconsistent with the medical record. The ALJ noted that in April 2003 Dr. Burton, plaintiff's treating physician, stated that plaintiff could return to work with no restrictions. Further, in July 2003, Dr. Burton indicated that plaintiff was working a physical labor job for 12 hours per day. The ALJ stated "[t]his evidence is not consistent with the claimant's allegations that he has been 'bed ridden' for the past two years and can barely walk one block without using an assistive device." (TR 31). The ALJ also noted that the record indicated that plaintiff was able to perform a wide range of activities of daily living, including driving, reading, watching television, cooking, mopping, occasional shopping, taking care of pets, visiting with family and friends and performing personal grooming tasks (TR 31). The ALJ noted that plaintiff walked from his vehicle to the hearing room. Collectively, these factors were substantial evidence for the ALJ in determining that plaintiff's allegations were not fully credible. ALJ concluded that "the claimant is only partially credible." (TR 31). The ALJ's basis for finding plaintiff was only partially credible was well-grounded in the record and the ALJ articulated its reasons for such a finding by citing specific examples in its decision.

Plaintiff failed to carry his burden of proving that he met the requirements of Listing 1.02 or 1.06 following July 7, 2003 and the ALJ's decision was supported by substantial evidence. Therefore, the Appeals Council's decision must be affirmed.

## **THE ALJ POSED AN ACCURATE HYPOTHETICAL TO THE VOCATIONAL EXPERT**

Plaintiff next argues that the hypothetical posed by the ALJ was inaccurate and, therefore, the VE's testimony does not support the ALJ's disability determination. Where an ALJ poses an accurate hypothetical to the VE, and the VE testifies that a person with the described limitations is capable of performing work that exists in significant numbers in the national economy, such testimony is sufficient to support a finding that the claimant is not disabled. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

Plaintiff contends that "[had] the ALJ given proper weight to Dr. Burton's opinion, her determination of David's residual functional capacity would have recognized David's need to lie down. Social Security's vocational expert testified that if David needed to lie down for an hour an (sic) a half each day, David would be precluded from all employment." Plaintiff's Motion & Brief in Support of Summary Judgment at 14.

Plaintiff's attorney posed the following question to the VE: "If an individual needs to lay down to alleviate swelling and pain, say, more than an hour during the course of a work day, I don't know, say an hour and a half, would that preclude all employment?" (TR 366). The VE responded, "Certainly." (TR 366). Plaintiff's argument goes too far. Plaintiff's assertion is not supported by the evidence. No where in the record does Dr. Burton or another physician give an opinion that plaintiff needs to lie down for an hour and a half each day. On February 13, 2003, Dr. Burton

indicated that plaintiff needed to lie down or recline at his discretion. (TR 163). No time limit was assigned to this action. On February 20, 2006, Dr. Burton affirmed that plaintiff "needs a job where he can lie down and recline at his discretion." (TR 329). The Appeals Council properly considered the 2006 statement to the extent that it related to the time period prior to the ALJ's decision on February 25, 2005. However, neither of Dr. Burton's statements regarding plaintiff's need to lie down or recline supports the notion that the plaintiff needs to lay down or recline for 1-1 ½ hours during the course of a work day. The statements do not indicate a time limitation for which plaintiff would need to rest each day.

Plaintiff's hypothetical question posed to the VE regarding a requisite 1 - 1 ½ hours to lie down or recline was conjecture and plaintiff points to no evidence to support this assertion. The ALJ's hypothetical question posed to the VE was accurate and supported by substantial evidence without including a limitation that required plaintiff to lie down or recline for 1 - 1 ½ hours per day. Based on the medical evidence, the ALJ determined that plaintiff could perform sedentary work with restrictions. As discussed above, the restrictions applied by the ALJ were derived directly from those offered by plaintiff's treating physician Dr. Burton. Therefore, the VE's testimony showing that plaintiff is able to perform work in the economy is sufficient to support a finding that plaintiff is not disabled. The Appeals Council's decision is based on substantial evidence.

**PLAINTIFF'S DISABILITY ENDED JULY 8, 2003**

Once a claimant has been awarded disability benefits, an ALJ must find that there has been a medical improvement in the beneficiary's condition before terminating the claimant's benefits. Title 42 U.S.C. § 423(f) provides:

> A recipient of benefits under this subchapter . . . based on the disability of any individual may be determined not to be entitled to

such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by –

(1) substantial evidence which demonstrates that –

    (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and

    (B) the individual is now able to engage in substantial gainful activity; or

(2) substantial evidence which –

    (A) consists of new medical evidence and a new assessment of the individual's residual functional capacity, and demonstrates that –

        (i) although the individual has not improved medically, he or she is nonetheless a beneficiary of advances in medical or vocational therapy or technology (related to the individual's ability to work), and

        (ii) the individual is now able to engage in substantial gainful activity, or

    (B) demonstrates that –

        (i) although the individual has not improved medically, he or she has undergone vocational therapy (related to the individual's ability to work), and

        (ii) the individual is now able to engage in substantial gainful activity;

42 U.S.C. § 423(f)(1)-(2). Any improvement in the beneficiary's impairment meets the statutory standard for medical improvement. *See* 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(c)(1). To determine whether medical improvement has occurred, the severity of the beneficiary's current

medical condition is compared to the severity of the condition "at the time of the most recent medical decision that you were disabled." 20 C.F.R. § 404.1594(b)(7). Here, the Appeals Council was required to compare the severity of plaintiff's condition on July 8, 2003, with his condition prior to that date, when the Appeals Council determined he was eligible for benefits.

To determine whether the improvement was related to the individual's ability to work, the residual functional capacity at the time of the prior decision is compared with the new residual functional capacity. 20 C.F.R. § 404.1594(c)(2). In the event that the previous impairment was based on the fact that the impairment at the time met the criteria of the Listing, then a residual functional capacity assessment would not have been made.

> If medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to your ability to work. . . . We must, of course, also establish that you can currently engage in gainful activity before finding that your disability has ended.

20 C.F.R. § 404.1594(c)(3)(I). The Appeals Council made the following determination, "During the period from March 25, 2002 through July 7, 2003, the severity of the claimant's impairment equaled the criteria listed in section 1.06 of 20 CFR Part 404, Subpart P, Appendix 1, and precluded the claimant from engaging in substantial gainful activity for at least 12 consecutive months." (TR 13). In making this determination the Appeals Council relied on the memorandum of medical expert Michael Dennis, M.D., and found that Dr. Dennis's determination was consistent with the medical record and the clinical data. The parties do not challenge this finding.

The Appeals Council then determined that beginning on July 8, 2003, there was medical improvement in plaintiff's condition related to plaintiff's ability to work:

> Beginning on July 8, 2003, the claimant has the following severe impairment: status-post fracture and arthrodesis of left ankle, but *does not* have an impairment or combination of

-21-

impairments which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

(TR 13) (emphasis added). In making this finding the Appeals Council relied on the treating physician Dr. Burton's reports and noted that x-rays showed no evidence of osteomyelitis. The Appeals Council found that "The medical improvement is related to the claimant's ability to work because the decrease in the severity of the signs, symptoms and laboratory findings resulted in an increase in his functional capacity." (TR 12). The Appeals Council made the additional finding that "[a]lthough the claimant's residual functional capacity might be more reduced than that projected by Dr. Dennis, the Appeals Council finds that the claimant improved at least to the residual functional capacity assessed by the Administrative Law Judge." (TR 12). The Appeals Council adopted the ALJ's findings and conclusions that the claimant is not disabled for the period beginning July 8, 2003 (TR 11). As discussed above, the Appeals Council relied on substantial evidence and the opinion and reports of the treating physicians in its determination that plaintiff was not disabled as defined under the Social Security Act.

The Appeals Council applied the proper point of comparison standard as required under the law. The Appeals Council was required only to look at the evidence before and after the ending date of disability to determine if plaintiff's condition had improved such that he was capable of engaging in substantial gainful activity. The question here is whether there was substantial evidence to support the Appeals Council's determination that after July 8, 2003, plaintiff no longer met the Listing criteria

The Appeals Council, by its opinion and the portions of the ALJ decision that it adopted, considered the objective medical evidence and found that while limited, plaintiff was not totally disabled after July 7, 2003.

> The Appeals Council finds that the claimant's condition improved as of July 8, 2003 because there was a decrease in the severity based on changes in signs and symptoms as reported by treating physician Stephen Burton, M.D. The medical improvement is related to the claimant's ability to work because the decrease in the severity of the signs, symptoms and laboratory findings resulted in an increase in his functional capacity. The x-ray showed no evidence of osteomyelitis and no new changes although the claimant had been performing some physical labor. Although the claimant underwent arthrodesis of the left ankle on November 19, 2004, there was no increase in symptoms noted between March 23, 2004 and that date. . . . The evidence does not establish another period after June 2003 where the claimant was unable to walk or had drainage from an infection lasting at least 12 consecutive months. Although the claimant's residual functional capacity might be more reduced than that projected by Dr. Dennis, the Appeals Council finds that the claimant improved at least to the residual functional capacity assessed by the Administrative Law Judge.

> The appeals Council considered the claimant's statements concerning the subjective complaints and adopts the Administrative Law Judge's conclusions in that regard for the period after July 7, 2003. The Appeals Council finds that the claimant can perform sedentary work permitting a sit/stand option and the ability to prop his feet 50% of the time.

(TR 12). In its decision, the Appeals Council found both that on July 8, 2003, plaintiff no longer had an impairment that met the Listing and as of July 8, 2003, there was an increase in plaintiff's functional capacity. There was no error in selecting July 8, 2003, as the termination point of plaintiff's eligibility for benefits because there was substantial evidence to support such a conclusion. Accordingly, plaintiff's Motion for Summary Judgment should be denied, that of defendant granted, and the instant Complaint dismissed.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 12, 2007                              s/ Mona K. Majzoub_____
                                                  MONA K. MAJZOUB
                                                  United States Magistrate Judge

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Date: July 12, 2007 s/ Lisa C. Bartlett_____
Courtroom Deputy